1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVY SHANNE ACORIN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant. | Case No.:  24-cv-00036-AJB-BLM<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY ACTION PENDING ARBITRATION**<br><br>**(Doc. No. 26)** |

Presently before the Court is Defendant Experian Information Solutions, Inc.'s ("EIS") motion to compel arbitration and to stay action pending arbitration in Plaintiff Ivy Shanne Acorin's civil action for alleged violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, and the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785, *et seq.* (Doc. No. 26.) The motion has been fully briefed, (Doc. Nos. 28, 29), and the matter is suitable for determination on the papers. Accordingly, the Court **VACATES** the hearing set for Thursday, January 16, 2025, at 2:00 p.m. For the reasons stated herein, the Court **GRANTS** EIS's motion.

## I.    BACKGROUND

In January 2020, while on deployment in Korea as an Army servicemember, Plaintiff discovered fraudulent transactions on her Wells Fargo Credit Card, exceeding her limit.

1

(Complaint, Doc. No. 1, ¶¶ 27, 29, 30.) Plaintiff immediately contacted Wells Fargo to dispute the transactions and request the closure of her Wells Fargo account, but this request was denied. (*Id.* ¶¶ 31–32.) Plaintiff was informed she was required to go to a Wells Fargo branch in person to make said request, despite her deployment. (*Id.* ¶ 32.) Thereafter, in April 2020, an unknown and unauthorized individual, using Plaintiff's personal information, took out a loan through Wells Fargo in the amount of $10,800.00. (*Id.* ¶ 34.) Wells Fargo refused to close Plaintiff's account until the fraudulent balance was paid off. (*Id.* ¶ 37.) As a result, Wells Fargo began reporting the fraudulent balance of both the credit card and the loan to Consumer Reporting Agencies, damaging Plaintiff's credit. (*Id.* ¶ 40.)

On November 25, 2020, Plaintiff sent a dispute letter to EIS reporting the fraudulent information. (*Id.* ¶ 41.) EIS never responded to Plaintiff's November 2020 written dispute. (*Id.* ¶¶ 42, 44.) On June 21, 2022, Plaintiff sent EIS a full Identity Theft Notification ("IDTN") via certified mail, which was received by EIS on June 25, 2022. (*Id.* ¶ 58.) EIS never provided a written response to Plaintiff's IDTN letter. (*Id.* ¶ 58(b).) As recently as June 11, 2023, EIS continued to report fraudulent accounts and balances from Wells Fargo, despite multiple requests for reinvestigation. (*Id.* ¶¶ 59–60.)

On March 10, 2020, Plaintiff enrolled in CreditWorks, EIS's credit monitoring service provided by EIS affiliate ConsumerInfo.com, Inc. ("CIC"), which also does business as Experian Consumer Services ("ECS"). (Declaration of Dan Smith ("Smith Decl."), Doc. No. 26-2, ¶¶ 1–3.) The online form she completed required Plaintiff to enter her personal information—i.e., her name, address, phone number, and e-mail address. (*Id.* ¶ 3.) After she entered her personal information, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. (*Id.*) Immediately below the boxes to enter her e-mail address and password was the following disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." (*Id.*)

The phrase "**Terms of Use Agreement**" in the disclosure was a hyperlink off-set in blue text and, if clicked, would have presented the consumer with the full text of the

agreement. (*Id.* ¶ 4.) Thus, before clicking the "Create Your Account" button, the consumer could view the entire text of the Terms of Use by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." (*Id.*) When a consumer clicked on the "Terms of Use Agreement" hyperlink, an additional window would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. (*Id.*) Immediately below the disclosure was a large purple button that reads: "Create Your Account." (*Id.*) The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage. (*Id.*) Experian presents the following representation of the webpage as it would have appeared at the time Plaintiff saw it:



(Doc. No. 26-2 at 7.)

After entering her information, Plaintiff clicked the "Create Your Account" button, thereby accepting and agreeing to the Terms of Use. (Smith Decl. ¶ 5.) Plaintiff would not have been able to successfully enroll in CreditWorks unless she clicked that button. (*Id.*) After enrolling, Plaintiff used the CreditWorks service, with her last login occurring on July 23, 2023. (*Id.*) Every version of the Terms of Use in effect during Plaintiff's enrollment included a section entitled "Amendments," which advised: "Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." (*Id.* ¶ 7.)

The Terms of Use contains an Arbitration Agreement, which requires Plaintiff to litigate, among other things, all claims against "ECS" that "relate to" or "arise out of" her agreement in arbitration. (*Id.* ¶ 6; Doc. No. 26-2 at 11.) The Arbitration Agreement and "Overview and Acceptance of Terms" section of the contract defines "ECS" to include its "affiliates," including "Experian Information Solutions, Inc." (Smith Decl. ¶ 6; Doc. No. 26-2 at 9, 11.) The Arbitration Agreement states arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes of the American Arbitration Association ("AAA"), and will be administered by the AAA. (Doc. No. 26-2 at 11.)

The Arbitration Agreement provides in relevant part:

ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. This agreement to arbitrate includes, but is not limited to:

claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute

4

(including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); . . . and claims that may arise after the termination of this Agreement.

(Doc. No. 26-2 at 11.)  Moreover, at the time of Plaintiff's last login on July 23, 2023, the Arbitration Agreement stated:

All issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is unenforceable, void or voidable including, but not limited to, on grounds of unconscionability . . . . Pursuant to this agreement, the arbitrator has been delegated with, and possesses, exclusive authority to resolve all of the above-enumerated types of disputes.

(*Id.* at 36.)  Pursuant to these provisions, EIS argues this Court must grant its motion to compel Plaintiff to arbitrate her claims. (Doc. No. 26.)

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, governs the enforcement of arbitration agreements involving commerce. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232–33 (2013). The Supreme Court has enunciated a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 344 (2011) ("The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings."). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Accordingly, the court's role under the FAA is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses

the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

The party seeking to compel arbitration "has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Arbitration is a matter of contract, and a party "cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit." *Tracer Rsch. Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994) (citation omitted).

The FAA provides that arbitration agreements are unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. District courts apply state law principles of contract formation and interpretation in determining which contracts are binding and enforceable under the FAA, if that law governs the validity, revocability, and enforceability of contracts generally. *See Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009); *see also Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" federal law. *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). However, courts are directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989).

## III.    REQUEST FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 states a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Here, Plaintiff requests judicial notice of (1) the 2017 CreditWorks Terms of Use Agreement, which was filed as Docket No. 23-1 in *Morgan v. Experian Information Solutions*, Case No. 3:21-cv-05783-JCC (W.D. Wash); (2) the AAA's Commercial

Arbitration Tribunal's September 18, 2022 ruling against EIS, which was filed as Docket 30-1 in *Morgan*; (3) the AAA's Commercial Arbitration Rules and Mediation Procedures; and (4) the AAA's Active Rules. (Doc. No. 28-2 at 2.) EIS does not oppose the request for judicial notice. (*See generally* Doc. No. 29.) However, the Court does not rely on these documents in reaching its conclusion below. Accordingly, the Court **DENIES AS MOOT** Plaintiff's request for judicial notice.

## IV.    DISCUSSION

EIS moves to compel arbitration, asserting the Parties agreed to arbitrate questions of arbitrability and that EIS may enforce the Arbitration Agreement as either a direct party or a third-party beneficiary. (Doc. No. 26 at 14–18.) Plaintiff responds that EIS's motion must be denied because EIS fails to prove that an agreement to arbitrate claims exists between the Parties, EIS waived its right to compel arbitration by substantially participating in court litigation, the agreement to arbitrate is unconscionable, and even if the agreement is valid, the dispute underlying this case falls outside the scope of the Arbitration Agreement. (Doc. No. 28 at 7.) Plaintiff does not dispute whether EIS may enforce the Arbitration Agreement. (*See generally id.*) Because it is foundational, the Court begins by analyzing Plaintiff's challenge to the existence of an agreement to arbitrate.

### A.    Existence of Agreement to Arbitrate

Plaintiff argues EIS fails to offer evidence of an agreement to arbitrate. (Doc. No. 28 at 14.) Specifically, Plaintiff asserts the declaration of CIC/ECS employee Dan Smith is made without personal knowledge, and that EIS fails to provide proof that Plaintiff actually submitted acknowledgement of the agreement to arbitrate. (*Id.*)

#### 1.    Mr. Smith's Declaration Is Admissible

EIS submits a declaration from Dan Smith, the Director of Product Operations for CIC/ECS. (Smith Decl. ¶ 1.) Plaintiff does not appear to meaningfully dispute the veracity of Mr. Smith's declaration. Rather, Plaintiff states EIS "has offered a generic declaration of an individual without personal knowledge of Plaintiff's alleged acquiescence to the arbitration agreement." (Doc. No. 28 at 14.)

In resolving a motion to compel arbitration, "[t]he summary judgment standard [of Federal Rule of Civil Procedure 56] is appropriate because the district court's order compelling arbitration 'is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (citation omitted). This means that the party seeking to compel arbitration, as under the summary judgment standard, bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Mr. Smith has been employed by CIC for over 14 years. (Smith Decl. ¶ 1.) His duties require him to be familiar with "how consumers enroll, the forms they must complete to enroll . . . webpages a consumer would have encountered to complete their enrollment . . . [and] which links or button the consumer clicked on," among other areas. (*Id.*) Mr. Smith's knowledge is based on information "acquired in the course and scope of [his] job responsibilities and through the review of pertinent documents maintained as business records[.]" (*Id.*) Additionally, "[b]ased on [his] familiarity with the CreditWorks enrollment process and Experian's databases that store consumer account information, [he is] able to retrieve a consumer's CreditWorks membership information upon receipt of that consumer's personally identifiable information." (*Id.*) Mr. Smith declares that when Plaintiff successfully enrolled in CreditWorks, she "had to complete a single webform." (*Id.* ¶ 3.) This webform "as it would have appeared when Plaintiff enrolled in CreditWorks" is attached to his declaration as "Exhibit 1." (*Id.*)

Plaintiff does not dispute that she successfully created a CreditWorks account. (*See generally* Doc. No. 28.) Mr. Smith's declaration establishes that Plaintiff could not have

created an account unless she completed the webform, depicted in Exhibit 1, and clicked the "Create Your Account" button. (Smith Decl. ¶¶ 3, 5.)

Mr. Smith's declaration establishes that he does have personal knowledge of the enrollment process as evidenced by his duties and responsibilities over the past 14 years as an employee of CIC and having reviewed internal records and documents. (*Id.* ¶ 1.) Also, "[p]ersonal knowledge may be inferred from a declarant's position." *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000). The Court finds Mr. Smith sufficiently demonstrated he has personal knowledge of the facts asserted in his declaration. *Scribner v. TransUnion LLC*, --- F. Supp. 3d ----, No. 2:23-cv-02722-JAM-CKD, 2024 WL 3274838, at *2–3 (E.D. Cal. July 2, 2024) (holding declaration by Dan Smith as to enrollment process was based on his personal knowledge as an employee of CIC over the past 14 years). Because Plaintiff does not dispute that she successfully created a CreditWorks account, there is only one reasonable conclusion given the enrollment process in effect at the time: Plaintiff was presented with the website depicted in Exhibit 1 and clicked the button entitled "Create Your Account." The Court next considers whether, by doing so, Plaintiff agreed to arbitrate her claims.

### 2. A Valid Arbitration Agreement Exists

Next, Plaintiff contends EIS fails to provide proof of Plaintiff's signature, evidence of her initials, evidence of activity at an IP address that belongs to her, or any other reliable proof of an agreement to the Terms of Use, which includes the Arbitration Agreement. (Doc. No. 28 at 14–15.) This, however, is unnecessary in this context.

"[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)). Parties may manifest assent through their conduct; "[h]owever, [t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022)

9

(citation omitted). The "principle of knowing consent" required to establish contract formation "applies with particular force to provisions for arbitration," *Knutson*, 771 F.3d at 566, and with equal force to contracts formed online, *Berman*, 30 F.4th at 855–56.

Historically, courts viewed contracts formed on the Internet as either "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use" or "'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen*, 763 F.3d at 1175–76. But now, online agreements are viewed as falling on a spectrum between "clickwrap" and "browsewrap." *Berman*, 30 F.4th at 856. Courts routinely find agreements falling closer to the clickwrap end of the spectrum to be enforceable because the consumer has received notice of the terms being offered and "knows or has reason to know that the other party may infer from his conduct that he assents" to those terms. *Id.* Courts are "more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.* In a sign-in wrap, or a "modified clickwrap agreement," a user is "notified of the existence of the website's terms of use and advise[d] . . . that by making some type of affirmative act, often by clicking a button, she is agreeing to the terms of service." *Moyer v. Chegg, Inc.*, No. 22-CV-09123-JSW, 2023 WL 4771181, at *4–5 (N.D. Cal. July 25, 2023) (finding that a modified clickwrap agreement demonstrated mutual assent to arbitrate).

Here, Plaintiff received the following disclosure in bolded text immediately above the "Create Your Account" button when creating her account: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement[.]" (Doc. No. 26-2 at 7.) The phrase "Terms of Use Agreement" in the disclosure was a blue hyperlink that, if clicked, would have presented Plaintiff with the full text of the Terms of Use, including the Arbitration Agreement. (*Id.*) Further, the "Terms of Use Agreement" hyperlink is "conspicuously distinguished from the surrounding text in bright blue font, making its

presence readily apparent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023). The notice is conspicuously displayed directly above the "Create Your Account" button and is in regular sized, bold font. (Doc. No. 26-2 at 7.) The language "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement" makes clear that the user's action constitutes a manifestation of an intent to be bound. *See Nguyen*, 763 F.3d at 1177; *Saucedo v. Experian Info. Sols., Inc.*, No. 1:22-cv-01584-ADA-HBK, 2023 WL 4708015, at *5 (E.D. Cal. July 24, 2023).

In this way, the Terms of Use is "somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else – click ['Create Your Account'] – to assent to the hyperlinked terms." *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-02953-WHO, 2017 WL 733096, at *5 (N.D. Cal. Feb. 24, 2017) (citation omitted). The Terms of Use is thus most like a "modified clickwrap agreement" or "sign-in wrap" because the CreditWorks sign-up screen informs users that if they click a button (the "Sign Up" button), they agree to the Terms of Use.

Moreover, "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858. The Court finds the CreditWorks sign-up screen effectively notified Plaintiff of the existence of the Terms of Use and advised that creation of an account constituted acceptance of those terms. Although Plaintiff was not required to provide her signature or initials to indicate her assent, EIS provided the Terms of Use adjacent to the "Create Your Account" button, included a hyperlink to the terms in a contrasting color, and informed the user that "Create Your Account" would indicate assent to the terms. Thus, because Plaintiff was informed that by clicking "Create Your Account" she was affirming that she would be bound by the Terms of Use, Plaintiff unambiguously assented to the Terms of Use. *See Driskill v. Experian*

*Info. Sols., Inc.*, --- F. Supp. 3d ----, No. 24-cv-00583-AMO, 2024 WL 4453292, at *4 (N.D. Cal. Oct. 8, 2024) (holding "there is no reasonable dispute that Driskill assented to the Terms of Use" because "the CreditWorks sign up screen makes the assent-manifesting actions—creating an account and acceptance of the Terms of Use—clear, and clicking the 'Create Your Account' button is the way to complete that action"); *Rangel v. Experian Info. Sols., Inc.*, --- F. Supp. 3d ----, No. 1:24-cv-00642-JLT-CDB, 2024 WL 4203361, at *4 (E.D. Cal. Sept. 16, 2024) ("Because Plaintiffs were informed that by clicking 'Continue' they were affirming that they would be bound by the Terms of Use, Plaintiffs unambiguously assented to the Terms of Use."); *Graf v. Match.com, LLC*, CV 15–3911 PA (MRWx), 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (holding that an arbitration agreement was valid because the users were required to affirmatively agree to the Terms of Use by clicking "Continue" when the user was informed that by clicking that button, they would be bound by the Terms of Use that were hyperlinked and available for review). EIS notes, and Plaintiff does not dispute, that Plaintiff enrolled in CreditWorks on March 10, 2020, with her last login occurring on July 23, 2023. (Smith Decl. ¶¶ 3, 5.) Thus, proof of Plaintiff's signature, initials, or other evidence is not required, as the creation of Plaintiff's account constituted acceptance of the Terms of Use.

Accordingly, there is no reasonable dispute that Plaintiff assented to the Terms of Use, and the Court concludes a valid agreement to arbitrate exists.

### B.    Delegation of Arbitrability

Having found that a valid agreement to arbitrate exists, the Court turns to the purported delegation provision within. Plaintiff does not challenge—let alone mention—the delegation clause. (*See generally* Doc. No. 28.)

The United States Supreme Court has "recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). The Court explained that the arbitrability of such threshold questions "merely reflect[s] the principle that arbitration is a matter of contract .

. . [a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 69–70. However, "[t]o challenge the delegation's validity, Plaintiff must both mention the delegation provision *and* make arguments specific to it." *Fischer v. Kelly Servs. Glob., LLC*, No.: 23-CV-1197 JLS (JLB), 2024 WL 382181, at *15 (S.D. Cal. Jan. 31, 2024) (citing *id.* at 72–74); *see Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015) ("[S]ince [the plaintiff] failed to make any arguments specific to the delegation provision, and instead argued that the [Arbitration Clause] as a whole is unconscionable under state law, we need not consider that claim, because it is for the arbitrator to decide in light of the parties' 'clear and unmistakable' delegation of that question[.]" (citations and internal quotation marks omitted)).

Here, Plaintiff's remaining arguments challenge the conscionability of the arbitration provision as a whole, whether this case arises out of or relates to the Terms of Use, and whether EIS waived its right to compel arbitration. (Doc. No. 28 at 15–26.) As to Plaintiff's unconscionability arguments, she contends first that requiring a consumer to participate in an arbitration governed by the Commercial Dispute Resolution Procedures is unconscionable, that the Arbitration Agreement is a procedurally unconscionable contract of adhesion, and the Arbitration Agreement is substantively unconscionable due to the one-sided nature of its benefits. (*Id.* at 21–24.) None of these attacks criticize the conscionability of the arbitration provision's delegation clause specifically, and Plaintff does not "explain how th[e] provisions [she cites] make *the fact of an arbitrator deciding arbitrability* unconscionable." *Holley-Gallegly v. TA Operating, LLC*, --- F.4th ----, No. 22-55950, 2023 WL 4674372, at *4 (9th Cir. July 21, 2023).

However, whether a party has waived its right to arbitrate is "presumptively for a court and not an arbitrator to decide." *Martin v. Yasuda*, 829 F.3d 1118, 1123 (9th Cir. 2016). If parties "intend that an arbitrator decide" the issue of waiver, the parties can rebut that presumption with "clear and unmistakable language to that effect" in their arbitration

13

agreement. *Id.* at 1124. As *Martin* noted, the presumption is not overcome even with an agreement stating "that '[a]ny controversy . . . involving the construction or application of the terms, provisions, or conditions of this Agreement or otherwise arising out of or related to this Agreement shall likewise be settled by arbitration'" or that "[a]ll determinations as to the scope, enforceability and effect of this arbitration agreement shall be decided by the arbitrator, and not by a court." *Id.* at 1124 (alterations in original) (citation omitted).

EIS argues the Parties' intent to delegate the waiver issue to arbitration is evidenced by the clear and unmistakable language in the Arbitration Agreement, which, at the time of Plaintiff's last login on July 23, 2023, stated:

> All issues are for the arbitrator to decide including, but not limited to, . . . **(iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate** . . . . Pursuant to this agreement, the arbitrator has been delegated with, and possesses, exclusive authority to resolve all of the above-enumerated types of disputes.

(Doc. No. 26-2 at 36 (emphasis added).)  Plaintiff does not make any argument to the contrary. (*See generally* Doc. No. 28.) The Court finds the arbitration clause contains a clear and unmistakable provision that the question of waiver based on litigation should be decided by the arbitrator. Indeed, while the clear and unmistakable standard is a high bar, no ambiguity exists in the phrase "[a]ll issues are for the arbitrator to decide, including . . . whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate[.]"

Accordingly, the Court orders that all questions concerning the arbitrability of the claims in this action be determined by the arbitrator. In the event the arbitrator decides the provision is enforceable, the arbitrator may consider the merits of Plaintiff's claims.

### C.    Stay of Action

Section 3 of the FAA provides that the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Experian has made such a request as to the claims

against it. (Doc. 26-1 at 18.) The Court stays this action as to the claims against Experian pending completion of arbitration. *See Hansber v. Ulta Beauty Cosmetics, LLC*, 640 F. Supp. 3d 947, 960 (E.D. Cal. 2022) (explaining that the court has discretion to "control its docket" and "stay litigation among nonarbitrating parties pending the outcome of the arbitration"); *see also Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 986 (9th Cir. 2017) (holding that the district court erred in denying a stay when the scope of arbitration was delegated to an arbitral tribunal).

## V.    CONCLUSION

Based on the foregoing:

1. Defendant EIS's motion to compel arbitration is **GRANTED**, (Doc. No. 26);

2. Pursuant to the FAA, the Court **STAYS** the judicial proceedings pending the outcome of any arbitration. *See* 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024);

3. The Parties are ordered to file a joint status report with this Court, detailing the progress of the arbitration in 180 days from the date of this order;

4. The Parties are further required to notify the Court that arbitration proceedings have concluded within fourteen (14) days of the issuance of the arbitrator's decision;

5. Because the action is now stayed pending the completion of arbitration, all dates currently on the calendar in this case are **VACATED**.

**IT IS SO ORDERED.**

Dated:  December 6, 2024

Hon. Anthony J. Battaglia
United States District Judge